1  Christopher D. Sullivan, SBN 148083
   csullivan@mcgranegreenfield.com
2  MCGRANE GREENFIELD, LLP
3  1 Ferry Bldg Ste 220
   San Francisco, CA 94111
4  Telephone:  (415) 283-1776
   Facsimile:  (415) 283-1777
5

6  Tanya L. Forsheit, SBN 192472
   tforsheit@proskauer.com
7  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
8  Los Angeles, California 90067-3206
   Telephone: (310) 557-2900
9  Facsimile: (310) 557-2193

10
   Steven M. Bauer*
11 sbauer@proskauer.com
   Kimberly A. Mottley*
12 kmottley@proskauer.com
   PROSKAUER ROSE LLP
13 One International Place
   Boston, Massachusetts 02110-2600
14 Telephone: (617) 526-9600
   Facsimile: (617) 526-9899
15 *admitted *pro hac vice*

16
   Attorneys for Plaintiff
17 MKS INSTRUMENTS, INC.

18                **UNITED STATES DISTRICT COURT**

19                **NORTHERN DISTRICT OF CALIFORNIA**

20                     **SAN FRANCISCO DIVISION**

21 MKS INSTRUMENTS, INC.,                  ) CASE NO. C 09-02297 JSW
                                           )
22              Plaintiff,                 ) **MKS INSTRUMENTS, INC.'S**
                                           ) **REPLY IN SUPPORT OF MOTION**
23      vs.                                ) **FOR PRELIMINARY INJUNCTION**
                                           )
24 NEW POWER PLASMA and DOES 1-10, inclusive, ) Date:    July 31, 2009
                                           ) Time:    9:00 a.m.
25              Defendants.                ) Location: Courtroom 11
                                           )          United States Courthouse
26                                         )          450 Golden Gate Ave.
                                           )          San Francisco, CA 94102
27                                         )
                                           )
28 ─────────────────────────────────────── )

I.   **SUMMARY OF THE ARGUMENT**

For this preliminary injunction proceeding, NPP has conceded that MKS is likely to succeed on its claims that the products NPP sent to Applied Materials, Inc. ("AMAT") infringe a valid MKS patent.[1]  Similarly, NPP has all but conceded the issues of balance of harm and public interest by not arguing either of those issues in its opposition.

NPP's only substantive opposition to MKS's motion is an argument that MKS somehow has failed to make the requisite showing of irreparable harm to support the relief it seeks.[2] According to NPP, because its infringing qualification process at AMAT is only intended to enable NPP to make non-infringing sales outside the United States, MKS should have to just sit back and watch that infringing activity, no matter what the expected future harm.

In fact, this is *precisely* the kind of irreparable harm that is best prevented by a preliminary injunction.  Future harm to MKS's market share, while certain, will be long term, incalculable and immediate, and is cognizable harm under the patent law.

There is no factual dispute that, absent an injunction, the qualification process will likely conclude within weeks, and that upon conclusion of those tests, NPP intends to sell the infringing products beyond the reach of U.S. patent law.  If NPP's products are qualified by AMAT for use with its products, MKS stands to lose 50-75% of its market share in a market which has provided MKS over $50 Million in revenue in each of the past two years.  (Dkt No. 6, p.8.)  While any loss

---

[1] While NPP makes a vague reference that it is "a third-party's use" which is the infringing activity at issue, NPP apparently has decided not to press the argument that it had no idea as to what AMAT was doing with NPP's products, or that NPP is not participating in the ongoing qualification process.  In fact, the documents NPP recently produced to MKS show unequivocally that NPP knew *exactly* why AMAT was testing its products, that the testing was for NPP's business benefit, and that NPP has had extensive involvement in that testing.  (*See* Ex. A filed herewith ("a long-distance technical meeting was held with NPP engineers in Korea via a conference call, involving key technical requests and questions.  NPP employees occasionally visited the Applied Corp. headquarters from Korea and met with Eng'rs of Applied Materials… .").  *See also* Section II.A.2 *infra*.

[2] NPP repeatedly refers to the fact that it has not yet been served as if that fact somehow should influence whether a preliminary injunction is warranted.  In fact, formal service of process is not required for issuance of a preliminary injunction, as NPP's counsel conceded at the June 24, 2009 hearing. (Tr. 38:21-39:6.)  MKS is working to effect service in this case.  The Korean Court has had the translated packet for service since June 29, 2009; however, MKS understands that the process typically takes four months to complete (two months for the Korean Court to serve, and another two months before the certification of service is returned).

1

MKS INSTRUMENTS, INC.'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 09-02297

of sales will be directly traced to the infringing activity in the United States, MKS's loss of its dominant market position will be irreparable. Given NPP's limited presence in the U.S., it is not at all clear that MKS would even be able to collect on a significant damage award rendered by this Court, nor would it be a simple process to calculate the full amount of damage or learn how many sales were taking place outside the United States given the limited discovery MKS might get in the countries where NPP will sell. The key point here is that this harm is not speculative - it is certain, and it is supported by NPP's own documents concerning the qualification process.

NPP's arguments in opposition that lost market share is not irreparable harm and that it is inappropriate to consider lost foreign market share as relevant harm caused by U.S. infringement are just wrong. In the end, nothing advanced in NPP's opposition merits a different decision on preliminary injunction than the Court's original decision to grant MKS's request for TRO.

**II.    ARGUMENT**

There are four relevant factors for the Court to consider in granting a preliminary injunction. NPP does not put in issue three of them, conceding the most important factor – likelihood of success on the merits – and not challenging that the balance of harm weighs in MKS's favor or that the public interest favors stopping patent infringement and preventing foreign-based competitors from coming into the U.S. to infringe a patent "just long enough" to allow them to then return home and take market share in countries with weaker patent protection.

NPP simply argues, without legal support, that the _real_ long term harm to MKS – lost future sales outside the United States – is not _so_ bad that an injunction should issue.

**A.    MKS's Anticipated Loss of Market Share Supports a Finding of Irreparable Harm.**

MKS does not need to rely on any presumption of irreparable harm in this case. Rather, MKS has come forward with affirmative evidence showing the likelihood (indeed, near certainty) of actual irreparable harm here. The evidence shows that MKS _will_ lose market share if the qualification process concludes, that those losses will be outside the U.S., and that any attempt to get discovery into those lost sales or collect damages for that loss would be made difficult by NPP's limited presence in the United States and the difficulty of gaining the evidence of lost sales

2

for sales made outside the United States.

### 1. Lost Market Share Can Constitute Irreparable Harm.

NPP does not dispute MKS's dominant position in the market. NPP instead argues that any loss of that market share outside the United States is just too bad.

Of course, whether any particular loss, including lost market share, is irreparable or not turns on the particular facts of any specific case. The issue is one of equity. The cases NPP cites do not stand for the <u>legal</u> proposition that lost market share is never irreparable and is always compensable by monetary damages. Instead, these are cases where the movant failed to meet its burden. *See, e.g., Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991) (vacating district court's entry of a preliminary injunction where that determination rested solely on a presumption of irreparable harm when plaintiff had not made the showing sufficient to support the presumption, and the evidence proffered for its showing of irreparable harm was insufficient); *Hologic, Inc. et al. v. Senorx, Inc.*, 2008 U.S. Dist. LEXIS 36693, at *51 (N.D. Cal. Apr. 25, 2008) (stating that loss of market share alone does not support a claim of irreparable harm where the patentee can be compensated economically); *White v. Seagate Tech., Inc.*, 1997 U.S. Dist. LEXIS 19162, at *15-16 (N.D. Cal. July 1, 1997) (finding no irreparable harm in case where patentee there did not practice the invention).

Most notable for its incorrectness is NPP's citation to this Court's decision in *Visto Corp. v. Sproqit Tech., Inc*. In fact, in *Visto*, this Court found the patentee *had* met its burden of showing irreparable harm. 413 F. Supp. 2d 1073, 1091-92 (N.D. Cal. 2006). In *Visto*, the patentee claimed anticipated lost sales to the competing infringing party as the irreparable harm, and this Court, while finding patentee's showing of irreparable harm "not particularly compelling," nonetheless found that

> given the direct competition posed by [defendant] and others, the rapidly changing nature of the technology and market, and the structure of the industry where sales could establish long-term relationships, this Court concludes [plaintiff] *has* established irreparable harm for purposes of preliminary injunction.

*Id.* (emphasis added). Here, as in *Visto*, the fact that NPP would be competing directly with MKS abroad, and the likelihood that NPP could establish long-term relationships with customers to

which it would not have had access but for qualification of its products by AMAT, support a finding that MKS's harm would be irreparable.

Another case NPP cites also supports a finding *of* irreparable harm based on lost market share.  In *Polymer Tech., Inc. & Polovina v. Bridwel et al.*, 103 F.3d 970, 975-76 (Fed. Cir. 1996), the Federal Circuit stated:

> Competitors change the marketplace.  Years after infringement has begun, it may be impossible to restore a patentee's … exclusive position by an award of damages and a permanent injunction.  Customers may have established relationships with infringers.  The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat.  Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

*Id.*  The Federal Circuit knows the realities of the marketplace -- if NPP is permitted to complete the qualification process and enter the market for a period of years prior to an adjudication on the merits, MKS's dominant position in the marketplace, and ability to set prices accordingly, will have been undermined, with no likelihood that it could be fully regained because of NPP's already-established relationships with MKS's customers.

More recently, in *Canon, Inc. v. GCC Int'l Ltd et al.*, the Federal Circuit cited several factors showing that injury, such as MKS stands to suffer, *would* be irreparable here, stating:

> Due to the difficulty (if not impossibility) of determining the damages resulting from price erosion and loss of market share, an award of money damages would not be sufficient.  Moreover, Defendants' business operations are geographically "far flung," making the enforcement of a money judgment "exceedingly difficult." … Thus, to the extent that money damages against Defendants were awarded, there appears to be a reasonable basis for the district court's finding that there would be little probability that [patentee] could effect the collection of a money judgment.

263 Fed. Appx. 57, 62 (Fed. Cir. 2008).

### 2. MKS's Anticipated Loss of Market Share Is Supported by NPP's Own Documents.

NPP attacks as speculative and unfounded MKS's claims that the infringing U.S. use of NPP's products to qualify them will cause MKS to lose sales of its products to NPP in non-U.S. countries.  (Dkt No. 49 at p.3.)  However, NPP concedes the very fact supporting this expectation

4

MKS INSTRUMENTS, INC.'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 09-02297

1  -- that the qualification process in the United States is for the purpose of permitting NPP to sell to
2  AMAT's customers abroad.  Specifically, while NPP's declaration filed in support of its Response
3  states that end-users of AMAT products "in non-U.S. countries request that Applied Materials
4  equipment purchased by them not include MKS' reactors," a document NPP produced in the
5  limited discovery period here tells the rest of the story.  (Dkt No. 49-1 at ¶ 20; *see* Ex. A filed
6  herewith ("it is our understanding that customers of [redacted] equipment are strongly requesting
7  that Applied Materials not affix the MKS RPG before shipment; Applied has thus suggested to
8  NPP that an initial evaluation be carried out by Applied Corp. on the NPP RPG.").)
9       There can be no question given NPP's own documented representations that the
10 qualification process is meant to allow AMAT to ship its products abroad, including to countries
11 where MKS has no patent rights corresponding to the '628 Patent, so that end-users can
12 incorporate NPP's infringing products instead.
13      **B.**     **MKS's Claim Has Nothing To Do With Extraterritorial Infringement.**
14      NPP tries to cloud the relevant issues here by arguing that MKS is attempting
15 extraterritorial enforcement of its patents.  Certainly, NPP could sell its products in countries
16 outside the United States where there is no MKS patent.  But, NPP cannot come into the United
17 States, infringe the MKS patent with impunity to develop and/or qualify an infringing product, and
18 then go abroad to make those sales.  If NPP wants to qualify its products outside the U.S. in
19 countries where MKS lacks patent protection, it is free to do so.  The fact that NPP fights this
20 motion so vigorously suggests it cannot do so without U.S. infringement.
21      Basically, NPP's argument distills down to the following:  1) MKS should not be able to
22 prohibit a competitor from engaging in infringement in the United States if that infringement
23 would only harm MKS in a foreign market; and 2) NPP should be entitled to use the United States
24 as its testing ground to permit it to then engage in what would be infringing activity overseas,
25 despite the explicit prohibition on such infringing use in the United States in 35 U.S.C. 271(a).  Of
26 course, neither premise is supported by law.
27      MKS simply wants to stop NPP from infringing MKS's patents in the United States.  This
28 is not a *de minimis* case.  This infringement will have an impact on MKS around the world.

5

In its Response, NPP cites several cases for the proposition that a patentee cannot obtain an injunction or recover damages based on foreign sales. Yet, <u>none</u> of the cases it cites support that premise. In fact, the cases NPP cites on this issue deal with extraterritorial activity as <u>the</u> infringing acts under review, for example in the context of 35 U.S.C. 271(f). None of these cases deal with the situation at present, in which there is no dispute that the ongoing U.S. use of NPP's products constitutes infringement under 35 U.S.C. 271(a), causing damage which may be felt abroad. *See Voda v. Cordis Corp.*, 476 F.3d 887, at n.9 (Fed. Cir. 2007) (evaluating foreign sales *as the infringing act*); *AT&T Corp. v. Microsoft Corp.*, 414 F.3d 1366, 1369 (Fed. Cir. 2005) (addressing issue of infringement under 35 U.S.C. 271(f)); *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp. et al.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (finding that foreign sales can never *infringe* a U.S. patent); *Avid Identification Sys., Inc. v. Global ID Sys. & Hull*, 29 Fed. Appx. 598, 602 (Fed. Cir. 2002) (faulting district court for failing to consider that only those products sold or used in the United States could result in liability); *North Am. Philips Corp. & Lockheed Sanders, Inc. v. American Vending Sales, Inc. et al.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (holding that the "tort" of patent infringement lies where the infringement occurs); *Amstar Corp.& Enviro-Clear Co., Inc. v. Envirotech Corp. & Energy Fuels Nuclear, Inc.*, 823 F.2d 1538, 1546 (Fed. Cir. 1987) (finding that "export of the elements before assembly could not have infringed the [patent at issue], nor could foreign manufacture and assembly of those elements have done so").

The Federal Circuit's *Roche* decision is important to this precise issue. In *Roche*, the defendant's sole defense was that it would not sell the product while the patent was still in force, and the Court found that to be actionable infringement. *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858, 865 (Fed. Cir. 1984). While the Federal Circuit deferred to the lower court on remand to render a decision on the appropriate relief (whether it be equitable / injunctive in nature, or monetary), the Court expressly stated that because it held "that there is infringement, Roche is entitled to a remedy." *Id.* at 865. The Court thus found the patentee to be actionably harmed because of the infringing "use" within the patent's statutory period, even though the harmful commercial activity of the infringer resulting from that use occurred solely after the patent expired. The Court went on to note that

6

> [i]t is clear that the economic injury to [patentee] is, or is threatened to be, substantial, even though the amount of material used in the tests was small. If the patent law precludes substantial damages, there exists a strange gap in the panoply (in its proper meaning, a suit of armor) or protection the patent statutes place around an aggrieved and injured patentee.

*Id.* at 866; *see also Madey v. Duke University*, 307 F.3d 1351, 1362 (Fed. Cir. 2002) (holding that Federal Circuit "precedent does not immunize any conduct that is in keeping with the alleged infringer's legitimate business, regardless of commercial implications.").

In another case similar to *Roche* and the facts here, a Court considered evidence of post-expiration sales as relevant and admissible to a damages analysis under the "accelerated reentry" theory of lost profits, summarizing the principle as follows:

> [A]ccelerated reentry damages are not based upon an assumption that the plaintiff's statutory monopoly on the market should be extended or that all of defendant's post-expiration sales should be deemed wrongful *per se*. What *BIC Leisure* allows are damages based *only* upon those post-expiration sales which the defendant would not have made but for its wrongful conduct before the patent expired.

*Amsted Indus. Inc v. Nat'l Castings, Inc.*, 1990 WL 106548, at *20 (N.D. Ill. July 11, 1990).

Here, the fact that the irreparable harm MKS is claiming is outside the U.S. does not make it any less relevant to an analysis of the propriety of injunctive relief or damages in this case. As long as the act of infringement occurs in the U.S. (on which there is no dispute for purposes of the present motion), MKS is entitled to relief. To hold otherwise would open the "gap in the panoply" rejected by the *Roche* Court.

**C.     NPP Has Not Advanced Sufficient Evidence to Rebut MKS's Showing of Irreparable Harm.**

NPP's attempts to rebut MKS's showing of irreparabe harm fall far short of the mark. NPP looks to the Federal Circuit's recitation of the following three categories of evidence that an accused infringer may use to rebut a finding of irreparable harm:

(1)    the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary;

(2)    movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or

7

(3)   movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

(Dkt No. 49 at p. 10 (citing *Polymer Tech., Inc. & Polovina v. Bridwel et al.*, 103 F.3d 970, 974 (Fed. Cir. 1996) (internal citations omitted)).)

As to the first *Polymer* factor, NPP renews its argument that the fact that it is willing to withdraw its products immediately after the infringing qualification process is complete should erase any liability for its U.S. infringement. Of course, the U.S. use alone is infringement under 35 U.S.C. 271(a), which is undisputed here, and completion of the qualification process would complete the activity needed to irreparably harm MKS, as discussed at length in MKS's motion and above.[3]

As to the second *Polymer* factor, NPP argues that MKS's grant of a limited license on these patents to one other company in the settlement context rebuts MKS's showing of irreparable harm. Not only is a single instance not sufficient to establish any pattern (indeed, together with that licensee, MKS dominates the entire U.S. market for these products without exception), but licensure of patents in a settlement context is irrelevant to analysis of irreparable harm. *See Medtronic, Inc. v. Telectronics, Inc.*, 5 U.S.P.Q.2d 1649, 1655 (D. Colo. 1987); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) (noting that Federal Circuit precedent supported district court's conclusion that presence of other competitors in the marketplace due to settlements with plaintiff did not negate patentee's claims of market share and revenue loss supporting its showing of irreparable harm in favor of preliminary injunction).

As to the final *Polymer* factor, NPP again raises its argument that MKS unreasonably delayed (for a less than two month period) filing its motion for preliminary injunctive relief. MKS will not re-brief this issue already fully handled in its moving papers and explained again at the June 24, 2009 hearing, which make clear that any delay was based on MKS's reliance on NPP's

---

[3] NPP lodges the remarkable claim that NPP offered to MKS's counsel that it would remove the accused samples from the U.S., which "would have stopped the ongoing experimental use of the samples by Applied Materials." (Dkt No. 49-1 at ¶ 12.) Of course, that is what MKS thought NPP offered to do on May 28, 2009; however, thereafter, NPP rebuffed MKS's requests for confirmation of the date that recall would be complete, and NPP ultimately revealed its true intentions only on June 12, 2009 to recall the products at AMAT only once the qualification process was complete. NPP's attempt to mischaracterize the record is belied by a simple review of the record before the Court. (See Dkt No. 6, pp. 3-5; Dkt No. 7, Exs. 9-15).

8

MKS INSTRUMENTS, INC.'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 09-02297

misleading representation that it was recalling of all its units from the U.S., and show that as soon as NPP notified MKS otherwise, MKS filed its Motion two business days later.  (See Dkt No. 6, pp. 3-5; Dkt No. 7, Exs. 9-15; and Hearing Tr. 43:3-44:17.)  Moreover, even if MKS had delayed two months without explanation, such is not the type of unreasonable delay adequate to rebut a showing of irreparable harm – indeed, the *Polymer* case itself excused a four month delay. *Polymer*, 103 F.3d at 976.

### D. Retention of the Units Within the Jurisdiction of this Court

NPP's Response does not lodge any arguments as to why the second portion of the relief sought by MKS – that the units remain within the jurisdiction of this Court – is unwarranted. However, NPP does voice its unfounded understanding that MKS must either agree the units can return to Korea, or otherwise must have MKS's outside attorneys take possession of and responsibility for the units during the pendency of an injunction.

MKS's concerns with accused devices leaving the country after infringing use are twofold.  First, destruction of infringing products can be an appropriate remedial measure following a finding of infringement, and MKS is not prepared to relinquish its rights in that respect, particularly in light of the difficulties MKS may find in enforcing monetary judgments against NPP in the future given NPP's limited presence in the United States.  *See, e.g., Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1549 (Fed. Cir. 1989) (discussing district court's order to defendant to deliver all infringing goods to patentee for destruction); *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 2008 WL 4756498, at *4 (W.D. Wisc. Oct. 29, 2008) (ordering delivery of infringing products to patentee for destruction).  MKS has additional concerns about agreement to retain only a certain number of these devices for discovery purposes, particularly given the fact that NPP's claims as to which devices it actually has at AMAT's facilities are an ever-moving target.  At the June 24, 2009 hearing, NPP's counsel represented his understanding that there were 14 devices, all of a single model.  (See Tr. 22:17-19 & 24:13-14.)  In a July 9, 2009 email, NPP's counsel represented that there were in fact 16 devices, including 2 separate models.  (*See* Ex. B.)  Now, according to the declaration NPP filed in support of its brief, it appears that there are in fact 19 devices, including 3 separate models.  (Dkt No. 49-1 at ¶ 11.)

9

Thus, even if NPP were to stipulate to identical structure, functionality and operation of these units (which it has not yet offered to do), MKS would have concerns about the accuracy of those statements.

Further, NPP's demands that MKS's outside counsel (not MKS, and not MKS's independent experts, neither of whom NPP will allow to access these devices) arrange and pay for secure storage of the NPP devices which were at AMAT's facilities, retain the equipment on an attorney-eyes-only basis, and insure it against loss or damage. MKS has never represented that it would do any of these things, nor should it have to. NPP sent these systems into the U.S. to AMAT - if AMAT does not want to hold them during the pendency of the injunction, it is NPP's obligation to figure out how to satisfy AMAT and this Court's order.

## III.     CONCLUSION

For the reasons set forth herein, as well as those discussed in MKS's Motion for Temporary Restraining Order and to Set Show Cause Hearing Re: Preliminary Injunction, and accompanying memorandum and declarations filed therewith, MKS's Reply filed in support of same, and those stated at the June 24, 2009 hearing, MKS respectfully requests that the Court continue the injunctive relief currently in place by issuing a preliminary injunction.

DATED: July 28, 2009

Christopher D. Sullivan
MCGRANE GREENFIELD, LLP

Tanya L. Forsheit
Steven M. Bauer*
Kimberly A. Mottley*
PROSKAUER ROSE LLP

*admitted *pro hac vice*

/s/ DRAFT

Attorneys for Plaintiff
MKS INSTRUMENTS, INC.

10